**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal Action No. 99-389-02 (RWR)** |
| | ) | |
| **HOMES VALENCIA-RIOS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The court of appeals remanded this case in part for an evidentiary hearing regarding defendant Homes Valencia-Rios' claim that his trial counsel, Elita Amato, had provided ineffective assistance of counsel by committing numerous errors that allegedly prejudiced the outcome of his case.  At the evidentiary hearing, the defendant failed to carry his burden of demonstrating that he received ineffective assistance of counsel at trial.  This memorandum opinion sets forth findings of fact and conclusions of law explaining this conclusion.

<u>FACTUAL BACKGROUND</u>

A more detailed history of the facts of this case can be found in <u>United States v. Mejia</u>, 448 F.3d 436 (D.C. Cir. 2006). "From June through November 1998, Costa Rican law enforcement officers conducted an investigation of a drug trafficking organization in Costa Rica, . . . involv[ing] multiple wiretaps, which captured Colombian nationals [Rafael] Mejia and [Valencia-

-2-

]Rios discussing large drug transactions with other members of their drug trafficking organization." Id. at 438.  Using information from the wiretaps, Costa Rican authorities intercepted three shipments of drugs in October 1998: 200 kilograms of cocaine from a truck at the border of Nicaragua and Costa Rica; 130 kilograms of cocaine from a truck at the border of Nicaragua and Honduras; and 25 kilograms of cocaine from a truck in Costa Rica.  Id. at 439.  Then, "[o]n November 30, 1999, a federal grand jury in the District of Columbia named Mejia and Rios in a one-count indictment that charged them with conspiring to distribute five or more kilograms of cocaine with knowledge and intent that such cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963." Id.  The conspiracy was alleged to have existed from June 1998 until at least November 1998 and spanned throughout Colombia, Panama, Costa Rica, Guatemala, and Nicaragua.[1]  Id.

Mejia and Valencia-Rios were arrested by Panamanian authorities and transferred to the custody of United States Drug Enforcement Agency ("DEA") agents Michael Chavarria and Joseph Evans in Panama City.  En route to the United States, the DEA

---

[1]Before trial, the grand jury issued a superseding indictment that enlarged the time period of the alleged conspiracy as beginning no later than November 1995 and continuing until February 2000, but was otherwise identical to the original indictment.  Id. at 439.

agents advised Valencia-Rios of the charge against him and informed him of his <u>Miranda</u> rights.  In Fort Lauderdale, Valencia-Rios "waived his rights and signed a written statement inculpating himself in drug trafficking in Central America."  <u>Id.</u> Valencia-Rios "admitted to participating with . . . co-conspirators in smuggling more than 100 kilograms of cocaine from Panama into Costa Rica during 1998[.]"  <u>Id.</u> at 441.  Trial counsel filed a pretrial motion to suppress Valencia-Rios' written statement, arguing that the statement was made involuntarily and obtained in violation of the defendant's Fourth and Fifth Amendment rights.  After an evidentiary hearing during which Amato cross-examined Chavarria about the environment in which Valencia-Rios made his statement, Valencia-Rios' motion to suppress his written statement was denied.

Mejia and Valencia-Rios were tried together.  The government presented the following evidence against Valencia-Rios.  Nine tapes of telephone calls between Valencia-Rios and other members of the conspiracy were introduced into evidence.[2]  <u>Id.</u> at 440. Witness Juan Delgado, an inmate who met Valencia-Rios during his pretrial incarceration, identified Valencia-Rios' voice on seven tapes.  Inspector Sigifredo Sanchez, who led the Costa Rican investigation, and Chavarria identified Valencia-Rios' voice on

---

[2]The jury viewed transcripts translating the Spanish heard on the tapes into English.

-4-

eight tapes.  Sanchez testified "as an expert in deciphering the
coded language used by drug trafficking organizations, and he
testified about the meaning of numerous conversations[,]"
including Valencia-Rios' conversations.  Id.  DEA Agent Michael
Garland testified "as an expert on drug trafficking organizations
in Central and South America," and "testified that the principal
market for drugs produced in Central and South America is the
United States."  Id. at 441 (internal quotation marks omitted).
"Chavarria and Evans testified regarding [Valencia-Rios'] post-
arrest statements[,]" including Valencia-Rios' admission that he
participated with co-conspirators to smuggle cocaine from Panama
into Costa Rica.  Id.  The government also introduced into
evidence Valencia-Rios' written statement obtained while he was
in custody in Fort Lauderdale.  During cross-examination, Amato
elicited from Chavarria that Valencia-Rios wrote his statement in
a small, windowless room in the Fort Lauderdale airport after
being in custody for more than ten hours and before he was given
an opportunity to call his wife.  (See Trial Tr. vol. X-B, 10-
71:25 to 10-74:6, Oct. 29, 2001.)  Valencia-Rios did not testify
at trial and was found guilty by a jury of the charged offense.
See Mejia, 448 F.3d at 441.  Post-trial proceedings ensued and
sentencing was postponed.

     Approximately one year after his conviction, but before
sentencing, Valencia-Rios moved for a new trial, alleging that

his trial counsel had provided ineffective assistance in the
preparation and presentation of his trial defense.  He alleged
that his trial counsel failed to: (1) inform Valencia-Rios about
investigative efforts undertaken in Panama and follow his
instructions as to which witnesses should be investigated; (2)
timely provide to Valencia-Rios a copy of his alleged confession;
(3) produce a defense version of transcripts of the taped
telephone calls that the government used at trial; (4) obtain and
present a handwriting expert to analyze the handwriting in
Valencia-Rios' written statement; (5) obtain and present expert
testimony on voice identification to challenge the government's
evidence identifying Valencia-Rios on the taped phone
conversations; (6) introduce into evidence in support of the
defendant's motion to suppress his confession a diagram produced
by the defendant purporting to be of the room where the
government obtained his written statement; (7) obtain a copy of
Valencia-Rios' Panamanian arrest order and arrest declaration to
challenge his arrest and transfer to the United States;
(8) obtain the testimony of potential exculpatory witnesses Jose
Antonio Ortega, Clemencia Otalvaro Morales, and Johnny Webb; and
(9) present as evidence co-defendant Mejia's failure to identify
Valencia-Rios' photograph.  Valencia-Rios' motion was denied as
untimely under Federal Rule of Criminal Procedure 33.  He was
sentenced to 324 months in prison.  Valencia-Rios appealed his

-6-

conviction and renewed the same ineffective assistance of counsel
claim on appeal.

The court of appeals affirmed Valencia-Rios' conviction for
conspiring to unlawfully import more than 5 kilograms of cocaine
into the United States, but remanded the case for "further
proceedings to consider the merits of [Valencia-Rios']
ineffective assistance of counsel claim." Id. at 459.  On
remand, Valencia-Rios renewed the same nine allegations of
ineffective assistance he raised in his untimely motion for a new
trial.  A hearing was held on the defendant's ineffective
assistance claim at which the defendant and trial counsel Amato
testified.  At the hearing and in his proposed findings of fact
and conclusions of law, Valencia-Rios raised a tenth reason why
he received ineffective assistance, alleging that trial counsel
failed to fully brief him on plea offers from the government.[3]

---

[3]Valencia-Rios did not identify as an issue before the
evidentiary hearing trial counsel's alleged failure to fully
brief him on plea offers.  Thus, after the government objected at
the hearing to questioning regarding this issue, defense counsel
was cautioned that he had "leeway to explore the general
communications" between Valencia-Rios and his trial counsel, but
"failure to talk about the plea agreement [was] not an issue
raised."  (Hr'g Tr. 68:4-7, Oct. 20, 2008.)  After the
evidentiary hearing, the parties were ordered to brief whether
Valencia-Rios' claim that trial counsel failed to fully brief him
on plea offers had been waived and, if this claim was not waived,
to estimate the duration of any supplemental hearing to be held
on this issue.  Valencia-Rios, through counsel, responded that he
was not requesting a supplemental hearing and, with the consent
of the government, requested consideration of this issue based on
the record developed at the evidentiary hearing.  This tenth
claim, then, will be addressed.

LEGAL BACKGROUND

"To prove constitutionally defective representation, the defendant must show (1) 'that counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" United States v. Cassell, 530 F.3d 1009, 1011 (D.C. Cir. 2008) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)); see Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) ("[A] defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel[.]").  To prove deficient performance, the defendant must show "'that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms.'"  Knowles, 129 S. Ct. at 1420 (quoting Strickland, 466 U.S. at 687-88); United States v. Gwyn, 481 F.3d 849, 853 (D.C. Cir. 2007) (same).  "Judicial scrutiny of counsel's performance must be highly deferential," and "[a] fair assessment of attorney performance requires that every effort be made to eliminate distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.  Therefore, "'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  Knowles, 129 S. Ct. at 1420 (quoting Strickland, 466 U.S. at 689); see United

-8-

States v. Askew, 88 F.3d 1065, 1070 (D.C. Cir. 1996).
"'[S]trategic choices made after thorough investigation of law
and facts relevant to plausible options are virtually
unchallengeable.'" Knowles, 129 S. Ct. at 1420 (quoting
Strickland, 466 U.S. at 690).  The burden is on the defendant to
prove his attorney's conduct was "unreasonable under prevailing
professional norms and that the challenged action was not sound
strategy." Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).

The prejudice prong "requires the defendant to demonstrate
that there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have
been different." Cassell, 530 F.3d at 1011 (quoting United
States v. Eli, 379 F.3d 1016, 1019 (D.C. Cir. 2004)) (internal
quotations omitted); see Knowles, 129 S. Ct. at 1422.  "When a
defendant challenges a conviction, the question is whether there
is a reasonable probability that, absent the errors, the
factfinder would have had a reasonable doubt respecting guilt."
Strickland, 466 U.S. at 695.  "A reasonable probability is a
probability sufficient to undermine confidence in the outcome,"
and a defendant "need not show that counsel's deficient conduct
more likely than not altered the outcome in the case." Id. at
693-94.  The court "must consider the totality of the evidence
before the . . . jury." Id. at 695.

-9-

During the course of representation, counsel owes to her client several duties, and a substantial breach of any of the duties owed amounts to deficient performance.  See United States v. DeCoster, 487 F.2d 1197, 1203-04 (D.C. Cir. 1973).  Counsel's obligations include a duty to (1) confer with the client without delay to ascertain potential defenses; (2) promptly advise the client of his rights and to take all actions necessary to preserve them; and (3) conduct "appropriate investigations, both factual and legal, to determine what matters of defense can be developed."  Id.  In Kimmelman, the Supreme Court elaborated on the duty to investigate, stating that "'[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"  477 U.S. at 384 (quoting Strickland, 466 U.S. at 691).  "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Id.

Where there is a failure to investigate a witness or other evidence that may violate the deficient performance prong, the defendant must still show how counsel's failure to investigate prejudiced the outcome of his case before a court can conclude counsel's performance resulted in ineffective assistance of counsel.  United States v. Debango, 780 F.2d 81, 85 (D.C. Cir.

-10-

1986).  Thus, for a claim based on counsel's failure to

investigate to succeed, a defendant must make

> "a comprehensive showing as to what the investigation
> would have produced.  The focus of the inquiry must be
> on what information would have been obtained from such
> an investigation and whether such information, assuming
> its admissibility in court, would have produced a
> different result." . . .  Courts should insist that the
> defendant show to the extent possible precisely what
> information would have been discovered through further
> investigation.

Askew, 88 F.3d at 1073 (quoting Sullivan v. Fairman, 819 F.2d

1382, 1392 (7th Cir. 1987)); see Gwyn, 481 F.3d at 855 ("[A]

defendant may not merely allege that counsel failed to undertake

an investigation.").  For example, in United States v. Moore, 104

F.3d 377 (D.C. Cir. 1997), the defendant argued that his counsel

was ineffective because counsel failed to subpoena witnesses who

allegedly would have established the defendant's innocence.  Id.

at 391.  In rejecting his claim, the court noted that the alleged

testimony of witnesses not subpoenaed "was tangential at best"

and the evidence supporting the defendant's guilt was so strong

as to render any error by defense counsel harmless."  Id.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.   FAILURE TO TRAVEL TO PANAMA AND FAILURE TO INVESTIGATE
     WITNESSES

Valencia-Rios claims that Amato failed to travel to Panama

and failed to follow his instructions on how to investigate his

case, including to interview key witnesses Jose Antonio Ortega,

-11-

the defendant's wife Clemencia Otalvaro Morales, Johnny Webb,

Mariana Ciceron Rivas, and a person identified only as Tomas.[4]

A.   <u>Findings of fact</u>

The defendant testified that he instructed his counsel to

travel to Panama to find potential witnesses Ortega, Rivas,

Morales, and Tomas as possible witnesses located in Panama.

(Hr'g Tr. 124:13-15, Oct. 20, 2008.)  He said that Ortega would

have testified about meeting the defendant in Panama and about

the defendant's "activities and the nature of his businesses."

(<u>Id.</u> at 125:3-5.)  He viewed Rivas as important because Rivas

"had known [the defendant] for six or seven years," and had

knowledge of the defendant's business in the "free trading zone

in Cologne between Panama and Colombia."  (<u>Id.</u> at 125:11-16.)

The defendant testified that trial counsel told him she was going

to go to Panama, and that trial counsel never explained why she

decided not to call Ortega, Rivas, or Tomas as witnesses.  (<u>Id.</u>

at 127:9-12.)

The defendant also testified that he instructed trial

counsel to investigate using Johnny Webb, who had been the

defendant's cellmate while incarcerated in D.C. Jail, as a

defense witness.  (<u>Id.</u> at 152:10-14.)  The defendant testified

that he provided trial counsel with a letter from Webb that said

---

[4]The defendant's challenge to trial counsel's failure to
interview Rivas and Tomas was not explicitly raised in his
motion, and is arguably waived.

-12-

Webb rejected inquiries from the government seeking his cooperation and that Webb wanted to be of assistance.  (Id. at 130:4-131:10.)  The defendant complained that trial counsel did not investigate Webb and did not inform him why she decided not to pursue Webb.  (See id. at 131:1-4.)

There is no dispute that trial counsel did not travel to Panama.  Trial counsel testified that she discussed with the defendant "a trip to Costa Rica and . . . the possibility of a trip to Panama" for his case.  (Id. at 22:1-3.)  Trial counsel did travel to Costa Rica with Heather Shaner, counsel for co-defendant Mejia.  Trial counsel recalled that the defendant provided her with the name of a potential witness located in Panama, whose identity she could not affirmatively recall, but whom she spoke with by telephone when she was in Costa Rica. (Id. at 23:4-18.)  She further testified that while in Costa Rica, she decided not to go to Panama, and that she informed the defendant of her decision.  (Id. at 22:8-15.)

With respect to investigating potential witnesses, trial counsel did not provide any testimony suggesting she attempted to find out any additional information about Rivas and Tomas beyond what Valencia-Rios told her.  She did interview a potential witness, Johnny Morales-Cooper, in a Costa Rican prison.  With respect to Webb, trial counsel conceded that she did not investigate Webb beyond "finding out that [he] was locked up and

who was representing him[.]" (Id. at 120:24-25.)  For the
defendant's wife Morales, however, trial counsel testified that
she had several conversations with Morales when she was in the
District of Columbia.  (Id. at 24:16-25.)

     In addition, trial counsel testified that she made the
strategic decision not to call witnesses who knew the defendant
well enough to identify the defendant's voice because the
government on cross-examination could have "destroyed him" by
having these witnesses listen to the incriminating tape
recordings and corroborate that it was the defendant speaking.
(Id. at 53:23-54:14; 78:10-13.)  She testified that she concluded
that potential witnesses Webb, Rivas, Tomas, and Morales-Cooper
should not have been called because they could all identify the
defendant's voice.  (Id. at 52:20-53:1; 54:15-17.)  Trial counsel
stated that she also concluded that Morales-Cooper would not have
been a helpful witness because Morales-Cooper admitted that the
defendant's tape recorded conversations were about drugs.  (Id.
at 52:19-53:7.)  Moreover, as for Webb, trial counsel testified
that she didn't believe Webb could have provided exculpatory
testimony for the defendant because he had not known the
defendant during the time of the charged conspiracy.  (Id. at
77:11-17.)  As for Morales, trial counsel stated that she decided
not to call Morales as a witness not only because she could
identify the defendant's voice, but also because the defendant

-14-

told her he did not want Morales involved and because Morales
knew of the defendant's drug trafficking activity.  (Id. at
52:20-53:10.)

The court finds that the defendant has established that
trial counsel decided not to travel to Panama after he instructed
his counsel to go there.  Taking the testimony in the light most
favorable to Valencia-Rios, at best, Amato's failure to travel to
Panama resulted in missed opportunities to speak with potential
witnesses Ortega, Webb, Rivas, and Tomas.  In addition, trial
counsel did not investigate Webb.  Nonetheless, the court finds
credible trial counsel's testimony that she adopted a strategy
not to call witnesses at trial who would be able to identify the
defendant's voice and finds that trial counsel's decisions about
whether to investigate certain witnesses stemmed from this
strategic decision.  Because she concluded from what the
defendant said that all of the Panamanian witnesses could have
identified the defendant's voice, they would not have been called
as trial witnesses.  With respect to Morales, the court credits
trial counsel's testimony that she had several conversations with
the defendant's wife about the possibility of her testifying
while Morales was in the District of Columbia and finds credible
trial counsel's proffered reasons for deciding not to call
Morales at trial.

B.   Conclusions of law

Here, important evidence against the defendant included
incriminating tape recorded narcotics-related phone conversations
purporting to bear the defendant's voice.  Using defense
witnesses who on truthful cross-examination would have been able
to identify the defendant's voice would have undermined the
defense attack on the reliability of the government's witnesses'
voice identifications.  Trial counsel's decision not to pursue
such witnesses was a reasonable strategic decision that was
within the range of competent professional assistance.  Moreover,
because trial counsel's decisions not to pursue investigations of
Ortega, Rivas, Tomas, or Webb were consistent with the reasonable
strategy not to call witnesses at trial who could identify the
defendant's voice, these decisions were also reasonable in the
circumstances.  The defendant has not carried his burden to show
that trial counsel's failure to travel to Panama or to
investigate witnesses Webb, Ortega, Rivas, or Tomas amounted to
deficient performance under the circumstances of his case.

Further, the defendant has neither shown with the level of
precision required what the proffered testimony of any of the
proposed witnesses would be, nor shown that it likely would have
had an impact upon the outcome of his case given the totality of
the evidence against him.  The defendant has not shown that
Ortega, Rivas, and Tomas had anything more than some general

-16-

knowledge about some business activity by the defendant.  The
defendant did not demonstrate that general testimony about some
business activity by the defendant could have successfully
rebutted the government's incriminating evidence that he
participated in a cocaine-smuggling conspiracy.  Similarly, the
defendant's cellmate, Webb, did not meet the defendant until
after the defendant had been arrested.  There is no showing that
Webb had any first-hand knowledge of the defendant's activities
during the period of the charged conspiracy.  Thus, the defendant
has not carried his burden to demonstrate how trial counsel's
failure to travel to Panama or to interview these witnesses
prejudiced his case.

     With respect to the defendant's wife Morales, the defendant
has not shown that trial counsel's performance was deficient.
Trial counsel investigated the potential utility of Morales
testifying during trial counsel's meetings with Morales in the
District of Columbia.  In addition, because Morales could
identify the defendant's voice and knew of his drug trafficking
activities, trial counsel's decision not to call Morales as a
witness was an objectively reasonable decision.  Further, because
Morales' truthful testimony likely would have weighed against the
defendant, the defendant has not shown that there was any
prejudice resulting from trial counsel's decision not to call
Morales as a witness.  Accordingly, the defendant has not shown

-17-

trial counsel's decisions regarding Morales to be either
deficient or prejudicial.

II.  DEFENDANT'S WRITTEN CONFESSION

The defendant contends that he received ineffective
assistance because trial counsel failed to give him and review
with him a copy of the confession the government said he wrote.

A.   <u>Findings of fact</u>

Trial counsel testified that she recalled showing the
statement to the defendant while he was in the D.C. Jail,
although she could not remember on what precise date, during one
of their first meetings before the hearing on the motion she
filed to suppress the statement.  (Hr'g Tr. at 30:11-24.)  She
recalled going through the statement "line by line" with the
defendant.  (<u>Id.</u> at 38:14-15.)  She further testified that she
would not have given him a copy to keep with him at the jail
because it was her policy not to leave copies of documents with
her clients in custody where other cellmates could gain access to
them and then later testify on behalf of the government against
her clients.  (<u>Id.</u> at 31:21-32:8.)  Trial counsel also testified
that the defendant was present for the hearing on the motion to
suppress at which the statement was introduced into evidence.
(Id. at 29:4-31:16; 80:4-19.)

The defendant testified that he remembered seeing the
statement in court, but he was never given a copy to keep and did

-18-

not remember being able to review the statement until after trial.  (Id. at 142: 10-17; 144:6-10.)  The defendant also testified that if he had been given a copy of his statement to keep in his cell at the jail, he would have "stipulated on how [the] proceeding [in which he wrote his statement] took place, the promises that the DEA agents made to [him] in order for [him] to receive a benefit" for "cooperat[ing] with the investigation of [his] case."  (Id. at 145:15-19.)  He did admit writing the statement.  (Id. at 144:4-5.)

It is undisputed that trial counsel did not provide the defendant with a copy of his statement for the defendant to keep in his possession.  Although the defendant testified that he did not remember seeing the confession until after trial, given how early trial counsel received a copy of the confession and how important it was to the case, the court finds trial counsel's recollection that she reviewed the defendant's written statement with the defendant at one of their early meetings probable and credible.  The court finds that the defendant had an opportunity to view the statement at the pretrial hearing on the defendant's motion to suppress the statement and at trial.  The statement was introduced into evidence on both occasions.  Although it is unclear exactly what action the defendant means he would have taken when he says he would have "stipulated" had he been given a copy of the statement, the court does not credit the implication

that some materially more beneficial course of action would have been followed.  The defendant was well aware of the existence of the statement and its contents, as he expressly admitted writing it, and was present at the pretrial hearing and the trial when the government introduced the statement into evidence against him.  The defendant offered no persuasive reason to support the notion that his having a copy to keep would have made any difference, or that not having a copy prejudiced him.

    B.  <u>Conclusions of law</u>

    The defendant has failed to show any deficient performance or prejudice with respect to trial counsel's consultation regarding his written confession.  It is of no moment that trial counsel did not give him a copy of the alleged confession to keep with him at the jail because trial counsel's practice of not leaving copies of confessions with incarcerated clients was a sound and sensible policy.  Even if trial counsel had not provided the defendant with sufficient access to his statement, the defendant has not carried his burden to show any prejudice resulting from trial counsel's failure to give him a copy of the statement to keep in his possession.  Because the defendant does not dispute that he was the author of the statement or that trial counsel cross-examined Chavarria to try to show that the statement was obtained in coercive circumstances, the defendant has not shown that trial counsel should have defended against the

-20-

government's use of the written statement any differently than
she did.

III. DEFENSE VERSION OF TAPE RECORDING TRANSCRIPTS

The defendant alleges that trial counsel failed to prepare
for use at trial a defense version of the transcripts of the tape
recorded phone conversations, and that failure was deficient
performance that prejudiced his case.

A.   <u>Findings of fact</u>

Trial counsel testified to a number of steps she took to
assure defense input in the transcripts used at trial.  She
personally reviewed the English-version transcripts of the tape-
recorded phone calls.  She employed a translator, Martha
Goldstein, to listen to all of the tape recordings and review the
government's version of the transcripts for errors in
ascertaining what Spanish word was said and errors in translating
the Spanish to English.  (Hr'g Tr. 39:9-41:19.)  She presented
the government with proposed changes to the transcripts prepared
by the government and the government accepted the proposed
changes without objection.  (<u>Id.</u> at 90:2-19.)  The defendant
provided no evidence to dispute that his counsel had defense
versions of transcript portions prepared and that the government
incorporated all of defense counsel's proposed changes into the
version of the transcripts used at trial.  The court finds that
trial counsel's recollection was credible, that there was a

-21-

defense version of transcript portions prepared, and that they
were fully incorporated into the transcripts employed by the
government at trial.

B.   Conclusions of law

Because trial counsel did produce defense versions of the
phone call transcripts that were employed at trial, the defendant
has adduced no facts in support of this claim.  Accordingly, the
defendant has not carried his burden to show any malfeasance or
error by trial counsel with respect to the transcripts of the
recorded phone conversations displayed at trial.

IV.   EXPERT TESTIMONY ON HANDWRITING AND VOICE IDENTIFICATION

The defendant contends he received ineffective assistance of
counsel because trial counsel did not present at trial expert
testimony comparing the defendant's handwriting to the
handwriting in the statement the government said he wrote in Fort
Lauderdale, or expert testimony on voice identification to
discredit the government's witnesses who identified the
defendant's voice on the tape recorded phone conversations.

A.   Findings of fact

The defendant admits that he wrote the written statement in
Fort Lauderdale that was introduced by the government against
him.  (Hr'g Tr. at 144:4-5.)  Trial counsel testified that in
light of the defendant's admitted authorship, she determined a
handwriting expert would not have been helpful to the defense.

-22-

(See id. at 78:24-79:19.)  Trial counsel further testified that
since she could not dispute that the defendant penned the
statement, her trial strategy was to argue that the content of
the statement was dictated by the DEA agents.  (Id. at 39:6-8.)
Trial counsel further testified that she retained Dr. Offshe, a
purported expert in false confessions, to assess whether
Dr. Offshe could testify on whether the defendant's statement was
written voluntarily.  (Id. at 35:8-36:16, 79:11-18.)  However,
Dr. Offshe concluded he would not be a helpful witness because he
believed the defendant's written statements were true.  (Id.)
Accordingly, trial counsel determined that Dr. Offshe's testimony
would not have aided the defense.  The defendant did not rebut
trial counsel's testimony regarding her consultation with
Dr. Offshe.

     With respect to trial counsel's alleged failure to present
voice identification testimony, trial counsel testified that she
listened to all the tape recordings of phone conversations along
with both the defendant and Morales-Cooper.  Both said that it
was the defendant's voice on most of the tapes, except for one or
two.  (Id. at 84:13-85:2.)  Given Valencia-Rios' own confirmation
that it was his voice on the bulk of the tape recordings, there
would have been little point in retaining a voice identification
expert whose accurate opinion could only have incriminated the
defendant.

-23-

Nevertheless, trial counsel still explored the possibility
of using voice identification expert JoAnne Payne as a defense
witness.  Ordinarily, Payne records voice samples in person and
by phone to use for comparisons to questioned recordings.  Trial
counsel considered instead having Payne not record samples, but
rather listen to only one of the calls that was not the
defendant's voice and one of the calls that was the defendant's
voice.  In an effort to create reasonable doubt about the
government witnesses' identifications, she would have Payne
testify that the voices on the calls were different.  However,
trial counsel ultimately concluded that any voice identification
expert used in this manner likely "would have been destroyed on
cross-examination" because the government could elicit that the
expert broke from her usual analytical protocol, and that trial
counsel gave her only limited information to use in forming her
expert opinion.  (Id. at 43:8-44:20.)  Instead, trial counsel
decided to attack on cross-examination the government's witnesses
who identified the defendant's voice on the recordings by showing
how little they knew the defendant and how little time that they
actually spent meeting with him.  (See id. at 45:14-18.)  The
defendant provided no evidence at the hearing to rebut that it
was his voice on most of the tapes or that a voice identification
analysis would not have produced an opinion favorable to the
defense.

B.   Conclusions of law

The defendant has not carried his burden of showing either deficient performance or prejudice with respect to trial counsel's decisions concerning the use of expert testimony on handwriting and voice identification.  Given that the defendant never denied writing the statement introduced against him or being the speaker on the bulk of the recordings, trial counsel's decision not to seek experts to analyze the statement and tapes was entirely reasonable under the circumstances and was not deficient performance.  Trial counsel did explore using a voice identification expert and made a tactical decision not to call a voice identification expert witness after determining that traditional voice identification analysis would not result in favorable testimony and that any favorable expert voice identification testimony procured through nontraditional methods would likely be undermined by cross-examination.

Further, the defendant's claims that trial counsel was ineffective because she failed to secure certain experts fails because the defendant has provided no evidence suggesting there was a handwriting or voice identification expert available who would have provided testimony favorable to him.  See United States v. Smith, 90 F.3d 591, 1996 WL 397489, at *2 (D.C. Cir. 1996) (unpublished Table opinion) (finding that the appellant's ineffective assistance claim on the basis that counsel had not

-25-

retained a drug expert could not succeed because there was "no
evidence to suggest that another chemist would have found
something other than [the] cocaine base" the defendant was
charged with distributing).  Accordingly, the defendant has not
carried his burden of showing trial counsel's decisions regarding
handwriting and voice identification experts were deficient or
prejudicial in any way.

V.   DEFENDANT'S DIAGRAM

The defendant alleges that he received ineffective
assistance of counsel because trial counsel did not introduce
into evidence in support of the defendant's motion to suppress
his written statement a diagram the defendant drew of the room in
which his written statement was obtained.

A.   Findings of fact

The defendant provided trial counsel with a drawing that he
made to illustrate the confined space in the Fort Lauderdale room
in which he wrote the statement used against him by the
government.  The defendant's diagram was a drawing on a plain
piece of paper purporting to show a person kneeling in front of a
table, holding a pen and writing on something, with two other
individuals in the background.  The drawing was not drawn to any
scale and trial counsel did not find it of significant help.
(Hr'g Tr. at 92:14-17, 105:22-107:2.)  Trial counsel said that
the defendant was not going to testify, and she concluded that it

-26-

would have been difficult to introduce the diagram into evidence without putting the defendant on the stand to authenticate the drawing since the agents could not be relied upon to say the diagram was a fair and accurate depiction.  (Id. at 37:4-38:3.) Accordingly, she made the tactical decision not to use the diagram at the motions hearing or at trial and instead, to question Chavarria about the coercive conditions in the small room when the defendant wrote his statement.  (See Hr'g Tr. at 38:4-7; 106:23-107:2.)

The available portion of the motions hearing transcript reveals that the circumstances under which Valencia-Rios made his written statement were explored during Chavarria's testimony. Chavarria testified during direct examination that upon arrival in Fort Lauderdale, he took Valencia-Rios to a private room in the airport where Valencia-Rios made his statement in the presence of Chavarria and Sanchez.  During cross-examination, trial counsel drew out additional facts about the circumstances under which Valencia-Rios made his statement, including that Valencia-Rios was separated from his co-defendant when he was taken to the room in which he wrote his statement, the size and temperature of the room, and that the room lacked windows.

Authenticating the diagram reliably likely would have required the defendant to testify, and the risk of subjecting the defendant to cross-examination by the government at the motions

hearing or at trial outweighed any potential benefit that the diagram would provide.  Further, the defendant has not shown that the diagram on its face best conveyed an image of a cramped, coercive environment.  Accordingly, cross-examination of Chavarria about the allegedly cramped, coercive environment in which the defendant wrote his statement made the same point the defendant sought to make with his diagram and was likely a better litigation strategy to choose over displaying the defendant's diagram.  To the extent that the diagram could have been used during cross-examination of Chavarria, given the facts drawn out by both parties during Chavarria's testimony regarding the environment in which Valencia-Rios wrote his statement, Valencia-Rios has not demonstrated that use of the diagram would have revealed additional material facts about his environment that would have altered the ruling on his suppression motion.

   B.   Conclusions of law

   The defendant has shown neither deficient performance nor prejudice regarding trial counsel's decision not to use at his suppression hearing his diagram of the room where he wrote his statement.  The choice of how to present evidence falls within the realm of litigation strategy that is generally protected from challenge.  See Kimmelman, 477 U.S. at 384.  In light of the great risk posed by having the defendant testify to authenticate his diagram and the minimal value of the diagram in communicating

the coercive conditions of the room, trial counsel's decision not to introduce his diagram and instead to reveal the conditions under which he wrote his statement through cross-examination of Chavarria was a sound, well-reasoned decision within the range of competent assistance.  Similarly, because the conditions of the room were actually revealed through cross-examination of Chavarria, the diagram would not have had an impact upon the outcome of the defendant's motion.  Accordingly, the defendant has not shown trial counsel's decisions regarding his diagram to be deficient performance or prejudicial to his case.

VI.  PANAMANIAN ARREST DOCUMENTS

The defendant alleges that trial counsel provided ineffective assistance because she did not adequately investigate and challenge the defendant's arrest in Panama.

A.   Findings of fact

The defendant testified that investigation of his arrest in Panama was important to him and that he asked trial counsel to bring him documents and evidence relating to his arrest.  (Hr'g Tr. 150:9-151:10.)  Trial counsel testified that she had her paralegal contact a lawyer in Panama, Carlos Herrera Moran, who was working for the defendant's wife, for assistance in obtaining information relating to the defendant's arrest.  (Id. at 14:10-21:20.)  Trial counsel also recalled making some phone calls to Panama, but did not specifically recall the dates of the phone

calls or to whom she spoke.  (Id.)  She further testified that
she wrote letters to the Colombian consulate asking them to
investigate the defendant's Panamanian arrest.  (Id. at 16:16-
21:20.)  Trial counsel also recalled conducting research into
case law regarding the impact of a foreign arrest on a
defendant's rights once he is taken into custody by the United
States and concluded that the law was not in the defendant's
favor.  (Id. at 26:15-27:9.)  The defendant does not dispute
trial counsel's recollection of the efforts she did undertake to
investigate his arrest and the court credits trial counsel's
testimony.  (Id. at 150:17-151:14.)

The defendant has provided no evidence as to the relevance
of his Panamanian arrest.

B.   Conclusions of law

Because the defendant has not provided any evidence as to
the relevance of his Panamanian arrest, the defendant has not
carried his burden to demonstrate that trial counsel's
investigation decisions regarding his arrest prejudiced his case
in any way.  Of note, on appeal, the defendant argued "that the
district court lacked jurisdiction over [his] case because DEA
agents took [him] into custody in Panama and transferred [him] to
the United States without following the formal requirements of
the extradition treaty between the two countries."  Mejia, 448
F.3d at 442.  The court of appeals rejected this argument,

-30-

upholding the application of the rule from <u>Ker v. Illinois</u>, 119

U.S. 436 (1886).  <u>See id.</u> at 443.  Under the rule in <u>Ker</u>,

> the power of a court to try a person for crime is not
> impaired by the fact that he had been brought within
> the court's jurisdiction by reason of a "forcible
> abduction" . . . .  [D]ue process of law is satisfied
> when one present in court is convicted of crime after
> . . . a fair trial in accordance with constitutional
> procedural safeguards.  There is nothing in the
> Constitution that requires a court to permit a guilty
> person rightfully convicted to escape justice because
> he was brought to trial against his will.

<u>United States v. Alvarez-Machain</u>, 504 U.S. 655, 661-62 (1992)

(quoting <u>Frisbie v. Collins</u>, 342 U.S. 519, 522 (1952) (citation

and footnote omitted)).  The court of appeals held that, under

<u>Alvarez-Machain</u>, a court first asks whether the abduction of a

defendant violates the extradition treaty between the United

States and the country in which the defendant was abducted.

<u>Mejia</u>, 448 F.3d at 442 (citing <u>Alvarez-Machain</u>, 504 U.S. at 662).

If the abduction does not violate the extradition treaty -- for

example, because abduction at issue is outside the scope of the

treaty -- then the rule in <u>Ker</u> applies, and a court has

jurisdiction over a defendant procured from the foreign country.

<u>Id.</u>  The court of appeals then upheld the finding that the

defendant's arrest was outside the scope of the treaty between

the United States and Panama and that the trial court had

jurisdiction under the rule in <u>Ker</u>.  <u>Id.</u> at 443.  Accordingly, to

the extent that the defendant is alleging that trial counsel's

investigation of the Panamanian arrest affected disproving the

court's jurisdiction over his case, such an argument is foreclosed as a matter of law by the court of appeals' decision. Because the defendant has not advanced any alternative theories for the relevance of evidence relating to his Panamanian arrest that could have been obtained but was not, the defendant has not carried his burden to show prejudice stemming from trial counsel's investigation of his Panamanian arrest.

VII. MEJIA'S FAILURE TO IDENTIFY THE DEFENDANT'S PHOTOGRAPH

The defendant contends that trial counsel provided him ineffective assistance because she did not pursue and present evidence that Mejia failed to identify the defendant's photograph.

A.   <u>Findings of fact</u>

The defendant provided no evidence to support his claim that Mejia could not identify the defendant's photograph.  Trial counsel testified that she could not recall Mejia's alleged nonidentification and the defendant did not testify on his own behalf as to this issue.  (<u>See</u> Hr'g Tr. 58:19-24.)  Further, trial counsel testified that she felt the government's evidence at trial did not suggest that Valencia-Rios and Mejia did know each other.  (<u>See id.</u> at 109:7-9.)

B.   <u>Conclusions of law</u>

Because the defendant failed to provide any evidence in support of this claim, he has failed to carry his burden of

showing either deficient performance or prejudice with respect to the trial counsel's decisions regarding Mejia's alleged nonidentification of Valencia-Rios' photograph.  Further, given that neither the government nor Mejia disputed Valencia-Rios' contention that he did not know Mejia, the introduction at trial of evidence about Mejia's nonidentification, if it existed, would not likely have made any difference in the outcome of the defendant's case.  Accordingly, the defendant has not carried his burden of proving that he received ineffective assistance of counsel with respect to Mejia's nonidentification of the defendant.

VIII.   BRIEFING ON PLEA OFFERS

Valencia-Rios contends trial counsel provided him ineffective assistance because she did not fully brief him on potential plea offers.

A.   <u>Findings of fact</u>

Trial counsel testified that she recalled several plea offers by the government before and during Valencia-Rios' trial, including oral offers and at least one written offer, seeking to have Valencia-Rios plead guilty and cooperate with the government.  (<u>Id.</u> at 60:25-61:16.)  Trial counsel recalled that she received at least one letter from the government, dated August 7, 2001, containing a plea offer.  She testified that she had the letter translated into Spanish for Valencia-Rios.  (<u>Id.</u>

at 62:2-10.)  Although she could not recall the specific date on
which she discussed this letter with the defendant or the
specific details of the conversation, trial counsel recalled that
she did discuss the plea offer in the August 7, 2001 letter with
the defendant and obtained his signature on the translated
letter, reflecting that he had read the letter but was not
interested in pleading guilty.  (Id. at 61:4-8; 68:8-16.)

Valencia-Rios testified that the only discussion he had with
counsel regarding potential plea offers occurred in connection
with the government's August 7, 2001 letter.  (Id. at 133:6-8.)
He further testified that he signed the letter and said he would
not accept responsibility because trial counsel did not present a
scenario under the Sentencing Guidelines that "could have been
favorable for [him] had [he] accepted the guilty plea."  (Id. at
133:14-18; see 148:3-7.)  The defendant did not testify or
present any other evidence demonstrating that there was any plea
offer from the government that he would have accepted had he
received different advice from his counsel.

Both witnesses appear to agree that trial counsel did
discuss the August 7, 2001 letter with the defendant.  To the
extent that trial counsel and Valencia-Rios' recollections of
whether there were additional discussions regarding plea offers
differ, for the reasons explained below, it is unnecessary to
determine whose recollection is more accurate.

-34-

B.   Conclusions of law

The defendant has not shown any prejudice stemming from
trial counsel's allegedly deficient efforts to brief him on plea
offers.  As for the government's August 7, 2001 plea offer,
Valencia-Rios' testimony revealed that he was informed of the
terms of the offer and that he decided not to accept the offer
because he was not satisfied with the offer's terms.  Neither his
testimony nor trial counsel's testimony suggested that Valencia-
Rios' understanding of that offer was incorrect or insufficient.
To the extent there may have been any other plea offers,
Valencia-Rios presented no evidence demonstrating that there was
a plea offer that he would have accepted had it been adequately
explained to him by trial counsel.  Nor does Valencia-Rios allege
any alternative theory as to how trial counsel's alleged failure
to fully brief him on plea offers would have altered the outcome
of his case.  Having failed to show that there was a plea offer
that Valencia-Rios would have accepted from the government or to
allege any alternative theory explaining how counsel's allegedly
deficient consultation regarding plea offers could have
prejudiced his case, Valencia-Rios has not established that trial
counsel's efforts to inform him of plea offers, even if deficient
in some manner, were prejudicial to his case.  Thus, the
defendant has not proven that he received ineffective assistance

-35-

of counsel with respect to trial counsel's efforts to brief him

on plea offers.

CONCLUSION AND ORDER

In light of the findings of fact and conclusions of law

above, the defendant has not shown that he received ineffective

assistance of counsel at trial.  With this Memorandum Opinion,

both of the two directives on remand from the court of appeals

now have been fulfilled.  See Mejia, 448 F.3d at 459.  Thus, it

is hereby

ORDERED that the Clerk transmit a copy of this Memorandum

Opinion to the Clerk of the Court of Appeals.

SIGNED this 5th day of August, 2009.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge